IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 18, 2011

## STATE OF TENNESSEE v. HORACE OSCAR WAKEFIELD

**Appeal from the Circuit Court for Fentress County**
**No. 9196     E. Shayne Sexton**

**No. M2009-01828-CCA-R3-CD - Filed January 24, 2012**

This is a delayed appeal from a jury conviction for driving under the influence of an intoxicant (DUI), ninth offense. Following a sentencing hearing, the Defendant, Horace Oscar Wakefield, received a sentence of four years in the Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence supporting his conviction. After a review of the record, we conclude that the evidence is sufficient to support the Defendant's conviction for DUI. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which and JAMES CURWOOD WITT, JR., J., joined. The Honorable J.C. MCLIN, on the panel to which this case was assigned, died September 3, 2011, and did not participate in this Opinion. We acknowledge his faithful service to this Court.

Harold E. Deaton, Jamestown, Tennessee (on appeal) and Paul Crouch, Assistant Public Defender (at trial), for the appellant, Horace Oscar Wakefield.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; John W. Galloway, Jr., District Attorney General; LaTasha Wassom, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

This case arises from a one-vehicle traffic accident involving the Defendant, which resulted in a charge by a Fentress County grand jury for DUI, ninth offense. *See* Tenn. Code Ann. §§ 55-10-401, -403. At the Defendant's trial on these charges, Jason Tompkins testified

that he lived on Highway 52 directly across from the Fellowship Church. Sometime in the late afternoon hours of November 18, 2006, two individuals knocked on his door and told him to phone the authorities because there was a wreck "on the curve." Mr. Tompkins, who had received "some rescue training in college," followed these two individuals down to the crash site, and his wife stayed inside and called 9-1-1. Mr. Tompkins never learned the names of these two individuals, and they "parted ways" after they returned to the crash site with Mr. Tompkins. He never saw them again.

When Mr. Tompkins arrived at the scene, he observed a car in the ditch on the opposite side of the road. He described the car as "jutting out into the road"—the "back wheels" of the vehicle were in the ditch, and the "front wheels were sitting more up on the road[.]" He also saw that the driver's side door was open "to the ditch." Mr. Tompkins encountered the Defendant sitting on the driver's side of the vehicle:

> [A] guy was sitting with his feet in the ditch and kind of rolled -- not -- he wasn't really laid down, but he wasn't really sitting up, but the bank goes upward so he could prop himself against the back of the ditch, and he had leaves all the way around his body on his clothes.

He did not observe any injuries or cuts on the Defendant. Mr. Tompkins stated that he also saw another man standing beside the car. He asked the other man if he was involved in the accident, and the man replied, "No, I'm in that car," pointing to a car parked on the other side of the road. Then, Mr. Tompkins asked the Defendant twice if anyone else was in the car with him, and the Defendant twice responded no, implying he was by himself. Based upon his observations of the scene, Mr. Tompkins opined that no one else was in the vehicle with the Defendant—only the driver's side door was open, neither the front or back windshield was "busted out" anywhere, and "it didn't look like anybody else could have been thrown out of the windows." Mr. Tompkins testified that, as he was talking with the Defendant, he could "definitely" smell alcohol: "It was just there. It wasn't just when he spoke. I mean, you could just smell alcohol."

Believing they were in danger if they stayed close to the car because it was "a real sharp curve" and oncoming cars would be unable to see them, Mr. Tompkins wanted to get the Defendant across the street. He asked the Defendant if he was hurt and capable of making it across the road; Mr. Tompkins and the other man then helped the Defendant to his feet. As they were walking across, the Defendant wanted to sit in the middle of the road. The Defendant started to sit down and said "[l]eave me alone" as they tried to keep him on his feet. Eventually, they were able to get the Defendant across the road. The other man then left the scene while Mr. Tompkins and the Defendant waited for emergency personnel to arrive. While waiting, Mr. Tompkins engaged in "small talk" with the Defendant, asking

him questions such as his name and where he lived. According to Mr. Tompkins, the Defendant responded to the first couple of questions, but he "was a little hard to understand . . . at times." The Defendant then "became pretty belligerent" and asked Mr. Tompkins if he was a lawyer. Mr. Tompkins responded that he was not a lawyer, and the Defendant then said, "Quit asking me any more g-----n questions." Mr. Tompkins was still with the Defendant when Deputy Michael K. Moon, an officer with the Fentress County Sheriff's Department, arrived. While Mr. Tompkins stayed on the scene, he "felt like it was time for [him] to back off and let the law handle it."

The following morning, when there was daylight outside, Mr. Tompkins went and looked at the crash site. When asked about what he observed, he testified to the following:

> Well, my mailbox is right next to the road, and you could see the next morning -- you could see where this car had went [sic] across the road and hit my gravels, because I have a graveled area between the highway and my grass; there's a graveled area. You could see where the car had went [sic] across the road just by skips, or not really skips, but you could tell where it -- it went off the highway in other words. You could see where it went off the highway and had thrown rocks and gravels all this way (indicating), you know, they were laying into my grass and had went [sic] around the curve, and you could see where he had entered back onto the highway on down farther . . . . And you could see on the highway where the black marks were it had went [sic] around into the ditch. It was just a semi-circle."

Deputy Moon testified that he was on duty on November 18, 2006, when he received a call from dispatch around 4:00 p.m., alerting him to a wreck on Highway 52. Deputy Moon responded to the call and proceeded to the scene. When Deputy Moon arrived, he saw the Defendant sitting on the ground talking to emergency personnel; "the First Responder" informed Deputy Moon that the Defendant was the driver of the vehicle. Deputy Moon went to the Defendant and asked him if he was hurt, and the Defendant replied that "he wanted to be left the hell alone, he was fine[.]" Deputy Moon informed the Defendant that an ambulance was en route, and the Defendant said, "You son of a b-----s leave me alone. I don't want to be bothered with you'uns [sic] no more."

When asked if he noticed "any smells about" the Defendant, Deputy Moon responded that he noticed that the Defendant had been drinking, and the Defendant replied affirmatively when subsequently asked if he had been drinking. When asked how much he had consumed that day, the Defendant replied "enough." Mr. Tompkins also testified that he heard this part of the conversation between Deputy Moon and the Defendant.

According to Deputy Moon, it was "like pulling teeth trying to get [the Defendant's driver's] license from him." Ultimately, the Defendant retrieved his license from his back pocket and gave it to Deputy Moon. Due to the Defendant's uncooperative nature, Deputy Moon thought it best to let emergency personnel tend to the Defendant, and he went to check out the vehicle. In order to prepare his accident report, Deputy Moon got the tag number and the registration from inside the car. Deputy Moon learned that the vehicle was registered to the Defendant.

The Defendant never made any admission to Deputy Moon that he was the driver of the car. However, Deputy Moon did not observe anyone else on the scene that appeared to have been in an accident. Based upon his investigation, Deputy Moon believed the Defendant was the driver of the vehicle.

The Defendant was transported from the scene by ambulance to the hospital. Deputy Moon went to the hospital and asked the Defendant to submit to a blood alcohol test. Deputy Moon testified that he presented the Defendant with the implied consent form and read from it verbatim. Deputy Moon informed the Defendant that he believed the Defendant was under the influence of alcohol based upon his observations of the Defendant. The Defendant refused to take the test and signed the form accordingly. The Defendant told Deputy Moon "to go to hell pretty much." When asked why he believed the Defendant was under the influence of alcohol, Deputy Moon responded that he made that determination based upon the nature of the crash, the Defendant's belligerent and rude behavior, and the odor of alcohol on the Defendant's breath.

Anthony Delk testified that he was a paramedic with the Fentress County Ambulance Service and that he was working as a volunteer firefighter on November 18, 2006. Around 6:00 p.m. that evening, Mr. Delk responded to a call of a wreck on Highway 52. Mr. Delk was the "First Responder" on the scene. When Mr. Delk arrived, the Defendant had already been moved across the road and was sitting on the ground. Mr. Delk tried to examine the Defendant, but the Defendant was "very belligerent, cursing a lot." He did not observe any visible injuries to the Defendant. Mr. Delk also noticed that the Defendant "did smell of some alcohol."

When Deputy Moon arrived, Mr. Delk remained in the vicinity while Deputy Moon spoke with the Defendant. At some point, Mr. Delk went to the Defendant's vehicle and inspected it; he did not observe any damage to the windshield.

When Mr. Delk's colleagues from the ambulance service arrived, another paramedic, Butch McClaren, was eventually able to examine the Defendant, but "it took some work." According to Mr. Delk, the Defendant "was given the option of he could go with the

ambulance service or he could go with the deputy[,]" and the Defendant became more cooperative with the paramedics after he was told this. Thereafter, Mr. Delk helped place the Defendant on a backboard and into the ambulance. Mr. Delk did not accompany the Defendant to the hospital.

Based upon this evidence, the jury found the Defendant guilty of DUI. The Defendant then entered a plea, admitting that it was his ninth offense. After a sentencing hearing, the trial court ordered the Defendant to serve four years in the Department of Correction as a Range II, multiple offender. The trial court also revoked the Defendant's driver's license for five years. Judgment was entered on November 5, 2007.

Defendant timely filed a post-conviction petition alleging ineffective assistance of counsel because trial counsel failed to appeal his conviction. The trial court appointed counsel for the Defendant and conducted a hearing. After the hearing, the court entered a finding that the Defendant had, in fact, received the ineffective assistance of counsel and granted the Defendant a delayed appeal under Tennessee Code Annotated section 40-30-113, ordered the trial transcript prepared, and ordered counsel to file a motion for new trial within 30 days. The motion for new trial was denied and this appeal followed.

ANALYSIS

The Defendant argues that the evidence was insufficient to sustain his conviction. Specifically, he contends that the State failed to prove that he was the driver of the automobile and that he was intoxicated at the time of the accident. The State disagrees, contending that the evidence is sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of

[both] direct and circumstantial evidence." *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In this case, there was no direct evidence that the Defendant was driving the vehicle. However, "[i]t is well established that circumstantial evidence alone may be sufficient to support a conviction." *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999) (citation omitted). Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. *State v. Dorantes*, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *Id*. at 380 (quoting *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id*. at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and][i]f the jury is convinced beyond a reasonable doubt, we can require no more." *Id*. at 380 (quoting *Holland v. U.S.*, 348 U.S. 121, 140, 75 S. Ct. 127 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of DUI in violation of Tennessee Code Annotated section 55-10-401(a)(1), which states that it is unlawful for a person "to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state . . . while: (1) under the influence of any intoxicant . . . ." Tenn. Code Ann. § 55-10-401(a)(1). Additionally, pursuant to Tennessee Code Annotated section 55-10-403, the conviction and punishment are enhanced if a defendant has prior DUI convictions. For a defendant to be convicted of DUI, the State must prove beyond a reasonable doubt that the Defendant was actually driving or in physical control of a vehicle at the time the violation allegedly occurred.

In determining whether the Defendant was in physical control of the vehicle, we consider "the location of the [D]efendant in relation to the vehicle, the whereabouts of the ignition key, whether the motor was running, the [D]efendant's ability, but for his intoxication, to direct the use or non-use of the vehicle, or the extent to which the vehicle itself is capable of being operated or moved under its own power or otherwise." *State v. Lawrence*, 849 S.W.2d 761, 765 (Tenn. 1993). "The same considerations can be used as circumstantial evidence that the [D]efendant had been *driving* the vehicle." *Id*. (emphasis in original).

While none of the State's witnesses provided any information regarding the location of the car keys or whether the engine was running, Mr. Tompkins testified that he went to the scene of a single-car accident in front of his home and found the Defendant, covered in leaves, sitting on the ground next to the car with the driver's side door open. The car appeared as if it had spun off the highway into the ditch. According to Mr. Tompkins, the car's "back wheels" were in the ditch, and the "front wheels" were on the road. While Mr. Tompkins saw another person present at the scene, upon questioning by Mr. Tompkins, this man responded that he was not involved in the wreck and pointed to his own car parked nearby. Mr. Tompkins twice asked the Defendant if anyone else was involved in the accident and was told "no" both times. Mr. Tompkins believed they were in danger, so he and the bystander helped the Defendant to his feet to move to the other side of road. During the process, the Defendant tried to sit down in the middle road, but they were ultimately able to get him safely to the other side of the highway. Following his arrival on the scene, Deputy Moon did not see anyone else in the area that appeared to be involved in the accident. All three of the State's witnesses, Mr. Tompkins, Deputy Moon, and Mr. Delk, inspected the Defendant's car and did not notice any damage or evidence of others having been present inside. Deputy Moon testified that he determined the vehicle was registered to the Defendant. Accordingly, we determine that there was sufficient evidence for the jury to find that the Defendant was driving the vehicle at the time of the accident.

Regarding the Defendant's allegation that the State failed to present sufficient evidence of his intoxication, all three witnesses testified that the Defendant smelled of alcohol and that he was unruly and cursed throughout the episode. The Defendant told Deputy Moon that he had been drinking that day, and when asked how much he had consumed, the Defendant said "enough." Mr. Tompkins also heard the Defendant admit to Deputy Moon that he had been drinking. Mr. Tompkins testified that the Defendant was hard to understand at times. Moreover, Mr. Delk stated that the Defendant was resistant to help from the paramedics on the scene. The nature of the wreck, the Defendant's belligerent and uncooperative behavior, and the smell of alcohol formed the factual bases for Deputy Moon's inference that a blood alcohol test was likely to reveal evidence of the offense. The Defendant refused to take such a test. Evidence of a defendant's refusal to submit to a blood alcohol test is admissible and may be considered evidence of his or her guilt. *State v. Bobby J. Young*, No. M1998-00402-CCA-R3-CD, 1999 WL 1179574, at \*4 (Tenn. Crim. App. at Nashville, filed Dec. 15, 1999), *perm. app. denied* (Tenn., July 17, 2000) (citing *State v. Frazier*, 914 S.W.2d 467, 470-473 (Tenn. 1996)). Accordingly, we also conclude that there was sufficient evidence for the jury to find that the Defendant was under the influence of an intoxicant while he was driving the vehicle and that there was sufficient evidence to sustain a conviction for DUI.

-7-

**CONCLUSION**

Based upon the foregoing, we conclude that the evidence is sufficient to support the Defendant's DUI, ninth offense, conviction beyond a reasonable doubt. The judgment is affirmed.

_____
THOMAS T. WOODALL, JUDGE